UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LUIS ALFONSO CORRALES ELIAS,<br><br>　　　　Defendant. | Case No. CR-17-0091-RHW<br><br>**ORDER GRANTING MOTION TO SUPPRESS** |

Before the Court is Defendant's Motion to Suppress Evidence and Statements. ECF No. 33. The Government filed its Opposition, ECF No. 38, and Defendant filed a Reply, ECF No. 42. An evidentiary hearing occurred in this matter on January 22, 2018, in Los Angeles, California. The Court has considered the filings, exhibits, live testimony, and arguments, and is fully informed. The factual statements in this order are findings of fact and are based on conclusions reached from observing the witness, video of the encounter, exhibits, affidavits, and information furnished about the Domestic Highway Enforcement Team.[1]

//

---

[1] Halloran described a news segment on Los Angeles ABC 7 that featured the Domestic Highway Enforcement Team, and citation to the news segment was furnished to and reviewed by the Court. *See* https://www.youtube.com/watch?v=VvalIaH-tPY. This type of program is also active in northern California along Interstate 5. *See U.S. v. Cornejo*, 196 F.Supp. 1137 (E.D. Cal. 2017).

**ORDER GRANTING MOTION TO SUPPRESS * 1**

# FACTUAL BACKGROUND

The Domestic Highway Enforcement Team of the Los Angeles Sheriff's Department is a special criminal investigation team employed to patrol Los Angeles County highways in search of criminal activity carried on in vehicles traveling on those highways. The team's purpose is not to enforce the traffic laws. Rather, the officers stop vehicles that have committed minor traffic offenses without the intention to issue traffic tickets, but to engage motorists in conversations in an attempt to detect potential criminal activity unrelated to the reason for the stop. Because the evidence of the crimes investigated are generally found inside the vehicle, to accomplish the mission the officer must endeavor to obtain access to the interior by consent or probable cause. The stop and subsequent questions are done to accomplish this mission.

On January 26, 2017, Deputy Adam Halloran of the Domestic Highway Enforcement Team encountered a black Nissan driven by Defendant Luis Alfonso Corrales Elias. ECF Nos. 33, 38. Halloran matched the speed of the Nissan and determined that Elias was driving approximately 71 miles per hour in a 65 miles per hour zone, and he also determined the vehicle had heavily tinted windows and that items were blocking the view of the dashboard. ECF No. 38-1 (Declaration of Halloran).[2] Based on these observations, Halloran pulled over Elias. *Id.* After both vehicles stopped, Halloran approached the Nissan at the passenger side window due to the fast moving highway traffic to the left. Upon approach, Halloran was "overwhelmed" by the strong odor of air freshener. *Id.* Halloran testified that in his experience large amounts of air freshener are often used to attempt to conceal the odor of drugs.

Halloran informed Elias of the traffic violations, discussed remedies, and stated that he would not write a ticket. *Id.*, Exhibit A (video recording of stop).

---

[2] Deputy Halloran also testified to the same facts at the January 22 hearing.

**ORDER GRANTING MOTION TO SUPPRESS \* 2**

Elias provided Halloran with a driver's license from Baja, Mexico. *Id.* The license made Halloran suspect that Elias was unlicensed in California. *Id.*

After receiving the driver's license, Halloran ordered Elias to exit the car and move to the rear, where Halloran performed a complete pat down search for weapons with Elias' hands behind his back. *Id.* Halloran found no weapons on Elias. *Id.* At the point that Halloran asked the Defendant to exit the car, the investigation of the traffic stop had ended and the stop was being prolonged to obtain consent or probable cause to search.

Thereafter, Halloran sought permission to search the car and found heroin, fentanyl, and other evidentiary items in a secret compartment.

## ANALYSIS

Elias moves now for suppression of the items found inside the secret compartment based on violations of his Fourth Amendment rights. The principle question presented by this motion is whether the traffic stop was extended by investigation related to the traffic stop or, if not, reasonable suspicion of criminal conduct justified the extension.

### A. The length of the traffic stop was unreasonable.

Halloran observed Elias driving over the speed limit with dark tinted windows and various items on his dashboard, and he pulled Elias over based on these violations of California traffic laws. *See Whren v. U.S.*, 517 U.S. 806, 819 (1996); *U.S. v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005). The traffic stop itself was reasonable and investigation about the traffic violations is proper.

#### 1. Halloran prolonged the stop to unreasonably search for criminal activity.

The Government first seeks to justify the length of the stop by arguing that the entire time was dedicated to the facts of the traffic stop, including questions regarding Elias' Mexican driver's license. This contention is not supported by the evidence. Halloran said that when he went to the passenger door he believed he

**ORDER GRANTING MOTION TO SUPPRESS * 3**

was investigating a drug smuggler based on the smell of air freshener, the use of that stretch of Interstate 5, and the initial purposes for the stop (speeding, window tinting, and obscured dashboard). Halloran formed this conclusion before Elias exited the car. Generally, an officer's state of mind does not invalidate an action as long as the circumstances, when viewed objectively, justify the action under the Fourth Amendment. *Ohio v. Robinette*, 519 U.S. 33, 38 (1996). Here, however, the Court finds that the actions were not objectively justified.

None of the questions asked and actions taken by Halloran after Elias exited the car were related to the reasons for the stop. Some questions Halloran posed thereafter may arguably be related to Elias' Mexican driver's license, but the questions and actions were predominately ones designed to continue the stop, such as where Elias worked, who was he visiting, did he have any firearms, drugs, money, questioning his wife about her family, the frisk, and finally asking for his consent to search. One of the tactics of the Domestic Highway Enforcement Team is to engage a driver in conversation unrelated to the traffic stop in order to observe something that will justify criminal investigation.[3] After Elias exited the car, Halloran extended the stop because he was motivated by the mission of the Domestic Highway Enforcement Team—to look for drug evidence. This included the frisk of Elias' person and the extended questioning, all unrelated to the reasons for which Halloran pulled Elias over in the first place.

The mission of a traffic stop is to address the underlying traffic violation and any related safety concerns, and the officer must not prolong this without "independent reasonable suspicion" to justify the extension. *Rodriguez v. U.S.*, 135 S.Ct. 1616 (2015); *see also U.S. v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). Halloran's primary objective was to secure consent or probable cause to search the

---

[3] The Team does not attempt to hide this tactic, but actively promotes its purpose. *See* https://www.youtube.com/watch?v=VvalIaH-tPY

**ORDER GRANTING MOTION TO SUPPRESS * 4**

car. He sought to investigate unrelated criminal activity, and he prolonged the stop in order to advance this objective. There is no contention that the request for consent to search the vehicle is related to the traffic mission—it was unrelated to any of the established purposes for which Halloran executed the traffic stop. The questioning, the frisk, and the request to search necessarily extended the traffic stop without independent reasonable suspicion.

In this case, the length of time that transpired between the stop and the search is approximately four minutes. On its surface, the traffic stop was not particularly long, but length of time is not necessarily dispositive in whether a stop was prolonged. As the Ninth Circuit has stated:

> *Rodriguez* specifically rejected the government's argument that an officer can prolong a traffic stop to conduct a non-traffic-related task so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances.

*Evans*, 786 F.3d at 786 (internal quotation omitted). Certainly in some circumstances, such a period would not be excessive. But here the Court also considers the mission of the Domestic Highway Enforcement Team, to investigate beyond the normal traffic stop mission. However, a detention must be limited to that authorized by the actual traffic stop mission or justified by reasonable suspicion. *Rodriguez*, 135 S.Ct. at 1616; *see also U.S. v. Gorman,* 859 F.3d, 706 (9th Cir. 2017); *U.S. v. Evans*, 786 F.3d 779 (9th Cir. 2015). In this case, extending the stop to gain consent to search is not justified by the mission of the traffic stop.

A policy of the police to create a department to make traffic stops only to seek consent or probable cause is troubling. Consent to search may be the first thing that is requested before asking for a license or insurance and thus arguably not unlawfully extending the stop under precedent. Yet significant privacy interests are implicated. The Court recognizes that such a policy seems consistent with precedent that does not permit the court to look at the motivation for the stop.

**ORDER GRANTING MOTION TO SUPPRESS * 5**

*Whren*, 517 U.S. at 813. However, where the extension of the stop must be motivated by the "mission of the stop", *see Rodriguez,* 135 S.Ct. at 1616, the subjective reasons for the extension are the determinative issue. Subjective motivation is the justification offered by the government to legitimize the extension.

Without some particularized reason, there is no legitimate law enforcement purpose to invade the privacy of traffic offenders by asking for consent to search. The policy advanced by the government would sanction asking all traffic offenders for consent to search, regardless of their location or circumstance. This practice is close to the roving patrols condemned in *Brignoni-Ponce*, 422 U.S. 873, 882 (1975); *see also infra* at p.8. The request for consent to search may prolong a stop for only seconds yet it imposes an enormous burden on the privacy interests of drivers. Most drivers would be anxious to move on and would fear that a denial of permission to search would indicate something to hide. They would logically think that a warning could turn into a ticket if consent was denied. Voluntariness of such consent, if given, does not justify the tactic. In this case, Halloran could only prolong the stop if he had reasonable suspicion of criminal conduct. The extension was not motivated by investigation of traffic offenses.

**2. Halloran did not have reasonable suspicion to extend the stop.**

No specific formula exists to determine reasonable suspicion, but like a probable cause determination, it takes into account the totality of the circumstances. *U.S. v. Sokolow*, 490 U.S. 1, 7-8 (1989). An officer must be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, [provide] a basis for *particularized* suspicion." *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (emphasis in original). Individual factors may be innocent when viewed in isolation, but when aggregated, they may constitute suspicious behavior. *U.S. v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002).

**ORDER GRANTING MOTION TO SUPPRESS * 6**

The Government proffered the affidavit and testimony of Halloran to establish that he reasonably suspected drug trafficking activity to further investigate and extend the traffic stop.[4] Halloran believed the location along Interstate 5 to be relevant, as detailed in his affidavit: "[t]he I-5 corridor is a high crime area known for drug smuggling, money smuggling, human trafficking, illegal weapons possession, stolen vehicles, and missing and child exploitation." ECF No. 38-1 at ¶ 3. Halloran also discussed a "strong odor of air freshener" detected when he approached the passenger window. ECF No. 38-1 at ¶ 6. Additionally, Halloran stated that the Baja driver's license Elias gave him at the stop "made [him] suspect that the driver was unlicensed in California." ECF No. 38-1 at ¶ 9. He did not, however, state that this factored into reasonable suspicion of drug trafficking. There are also the actual reasons for the traffic stop—speeding, window tinting, and obstructed windshield. The Court considers all of these reasons given as a whole.

First, the description of the Interstate 5 corridor as a "high crime area" for unlawful activity is not established. Reasonable suspicion "cannot be based on overbroad generalizations." *U.S. v. Sigmond-Ballesteros*, 285 F.3d 1117, 1124 (9th Cir. 2002). As Elias demonstrates in his briefing, the Interstate 5 corridor is a heavily-traveled route between northern and southern California, carrying roughly 70,000 vehicles daily in each direction at the location of the stop. ECF No. 42 at 5. Halloran provided no basis to conclude that a statistically or legally significant number of the vehicles on Interstate 5 carry contraband to differentiate it from other freeways. In fact, the exhibits suggest that the crime rate in this area is lower than in other areas along Interstate 5. ECF No. 42 at 5. In his testimony, Halloran made the obvious observations that drugs generally move north from Mexico and

---

[4] The affidavit more than the testimony is relied upon by the Court, although the Court has weighed both and does not find significant differences that affect the findings.

**ORDER GRANTING MOTION TO SUPPRESS * 7**

drug money moves south. He also stated that drugs and money had been found before in this area, but he offered nothing to suggest that the percentage of traffic so observed was more than other highways or other areas of Interstate 5.

Highways can be likened to rivers. The fact that one catches fish in one area of the stream doesn't mean that there are more or less fish there than in other places. It merely shows that one has fished there and caught fish.

Certainly, some locations naturally add to suspicion. Defined blocks and buildings may be observed to establish a higher likelihood of criminal activity than other areas. Nevertheless, the Supreme Court has already cautioned against broad and unlimited discretion based on the fact an interstate highway's location may make it more accessible for illegal activity. For example, in *U.S. v. Brignoni-Ponce*, the Supreme Court noted that proximity to the border is insufficient to justify roving-patrol stops. 422 U.S. at 882. After listing three large metropolitan areas, including San Diego—another city on Interstate 5—the Supreme Court noted that it was:

> "…confident that substantially all of the traffic in these cities is lawful and that relatively few of their residents have any connection with [illegal activities]. To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying [contraband], would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of [law enforcement]." *Id.*

The record does not support any legally significant differentiation in this case. The description of Interstate 5 as a "high crime" area lends no weight to the establishment of reasonable suspicion.

Second, Officer Halloran stated that when he approached the car he smelled a strong odor of air freshener. ECF No. 38-1 at ¶6. He testified that, in his experience, heavy air freshener may be associated with masking the smell of large quantities of drugs. While not directly testified to, the Court concludes from the

**ORDER GRANTING MOTION TO SUPPRESS * 8**

evidence that the intensity of the smell of air freshener was significantly less at the passenger window than when Halloran opened the trunk and when he was inside the car.

While the odor of air freshener can be an important factor to consider, the Court is unaware of a case in which air freshener alone was the sole valid factor to provide reasonable suspicion to extend a traffic stop. *See U.S. v. Arana-Duarte*, 244 F.Appx. 121, 122 (9th Cir. 2007) (finding reasonable suspicion based on multiple valid factors); *U.S. v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000) (finding reasonable suspicion based on strong smell of perfume and the unusual answers defendant gave to multiple questions); *U.S. v. Apeland*, 238 F. Appx. 272, 274 (9th Cir. 2007) (finding reasonable suspicion based on air freshener odor as well as nervous behavior, answers "all over the board" and inability to stand properly); *see also U.S. v. Goss*, 256 Fed. Appx. 122, 124 (9th Cir. 2007) (finding reasonable suspicion on numerous factors, including the *appearance* of many air fresheners, but not smell).

Even if extreme odor were enough, on this record, the Court is unable to weigh the amount of the odor experienced by Halloran when compared to legitimate uses of air fresheners. Air fresheners mask all sorts of normal odors, such as spilled milk, messes made by children and babies, pets, spoiled food, tobacco smoke, etc. Some individuals merely like the smell. Using air freshener odor to permit the further detention of any vehicle committing a traffic violation on Interstate 5 cannot be justified because it would sweep too much innocent conduct into illegal seizures. Absent additional valid reasons, reasonable suspicion is not established.

Finally, the Court considers the traffic violations (tinted windows, Elias' speed of 71mph in a 65mph zone, and obstructed windshield) and the Mexican driver's license. Halloran did not testify that the driver's license was considered as part of his reasonable suspicion, nor did he relate how the traffic violations

**ORDER GRANTING MOTION TO SUPPRESS * 9**

contributed to his suspicion that Elias was trafficking drugs. The Court can see no relation between these observations and drug smuggling, and neither Halloran nor the Government argue such a relation. The Court should only look to the "articulable factors that are truly relied on by a police officer" when determining the reasonableness of the conduct. *U.S. v. Thomas*, 863 F.2d 622, 627-28 (9th Cir. 1988). Moreover, the failure to articulate other reasons is especially significant in this case, as the purpose of the stop was to develop probable cause or gain consent to search the car.

The Court concludes that the only factor legitimately relied upon was the strong smell of air freshener which is insufficient for the reasons given.

### B. Absent reasonable suspicion, Halloran's conduct from the time he asked Elias to exit the vehicle was unconstitutional.

Immediately upon ordering Elias from the vehicle, Halloran frisked Elias. For a frisk to be constitutional, it must be both (1) justified at its inception and (2) continued in scope to a carefully limited to discover weapons that may be used to assault an officer. *U.S. v. I.E.V.,* 705 F.3d 430, 433 (9th Cir. 2012). A frisk is justified at the inception if there is a reasonable suspicion that the suspect is armed and dangerous. *Id*. at 435.

In this case, there is no evidence to support reasonable suspicion that Elias was armed or dangerous. Aside from traffic violations, the only potential crime for which Halloran has articulated valid reasonable suspicion at the point he completes the frisk is that Elias may be unlicensed in California, which is not a violent crime that would raise concerns for officer safety. Moreover, the video demonstrates Elias behaved in a calm, friendly manner. Despite the allegations that he was wearing multiple layers (ECF No. 38-1 at ¶10), the video also demonstrates that the clothing was largely appropriate for the time of year and slim-fitting on Elias. Finally, when an officer has already completed a significant portion of his traffic investigation without facing any threatening behavior, this undermines the need for

**ORDER GRANTING MOTION TO SUPPRESS * 10**

a pat down. *I.E.V.*, 705 F.3d at 438.

Recognizing that both the prolongation of the stop and the frisk were violations of Elias' Fourth Amendment rights, his consent to search the vehicle is tainted by illegality and ineffective to justify the search. *See Florida v. Royer*, 460 U.S. 491, 501-09 (1983). To be admissible following an illegal seizure, the Court must look to see whether it is "sufficiently an act of free will to purge the primary taint." *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963). This means it is both voluntary and not exploited by the prior illegality. *U.S. v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007).

The prosecution must demonstrate that the consent to search was voluntary. *Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973). Courts consider the following factors to determine if consent was voluntary: (1) whether the defendant was in custody at the time of consent; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified he had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained. *U.S. v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (citing *U.S. v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)). None of the factors are dispositive, but rather "serve as guideposts." *Brown*, F.3d at 415.

First, when Elias was asked for consent, for the purposes of the voluntariness analysis, Elias was in custody—that is to say, he was seized. *U.S. v. Washington*, 490 F.3d at 775 (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *Gorman,* 859 F.3d at 714 (citing *Whren*, 517 U.S. at 809-10)). It is important to note the

**ORDER GRANTING MOTION TO SUPPRESS** * 11

distinction between custody that triggers *Miranda* rights[5] and the interpretation of custody for purposes of a voluntary consent analysis. The court must consider "whether the cumulative circumstances escalated to the point" where the defendant is effectively in custody. *U.S. v. Redlightning*, 624 F.3d 1090, 1103 (9th Cir. 2010).[6]

Generally, a traffic stop is not custody. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). However, in *Washington* the court found the defendant to be in custody for the purposes of the voluntariness analysis because a "reasonable person would not have felt free to terminate the encounter and leave." 490 F.3d at 775. Thus, the court conflates seizure with custody for the analysis. Here, Elias was pulled over for a traffic stop, from which a person is not free to leave at will. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Halloran had not given Elias permission to return to the car, and the video demonstrates Halloran was still in physical possession of Elias' driver's license at the time he asked for consent to search. Moreover, the seizure is further solidified by the frisk of Elias' person, which as detailed prior, was unconstitutional.

In addition, there is nothing in the record that demonstrates Elias was aware that he could refuse Elias' consent or that he knew a search warrant could be obtained. Elias was not proficient, much less fluent, in English. Halloran, despite some basic Spanish, did not speak Spanish well. There was no written waiver, nor was Elias explained his rights in English or in his native language, and it is unclear that Elias understood his rights or had any experience with the American justice system, all relevant factors for the Court to consider in the case of consent by a

---

[5] Elias was not in custody to trigger *Miranda* warnings at the time he offered consent. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] The Court recognizes this is a bit of an unsettled area in the Ninth Circuit. *See U.S. v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) (adopting *Miranda* definition of custody and finding defendant was not in custody during *Terry* stop at campsite). However, based on the lengthy analysis of *Washington*, which remains good law in this Circuit, the Court analyzes custody for the purpose of consent under the rationale of this holding.

**ORDER GRANTING MOTION TO SUPPRESS \* 12**

foreign national. *See U.S. v. Amano*, 229 F.3d 801 (9th Cir. 2000) (analyzes validity of *Miranda* rights *and* consent to search).

Voluntariness does not have a bright-line rule, but must be assessed under all of the circumstances. *Robinette*, 519 U.S. at 34. For example, in contrast, the driver in *Robinette* was already given a warning and returned his license, thereby making him technically free to leave when he was asked for consent to search. *Id. Robinette* also did not involve a frisk. Here, Elias was out of his car, without his license, frisked for weapons, as a non-English speaker without the aid of proper translation. Based on the totality of the circumstances, the Court does not find Elias' consent to search the vehicle was voluntary.

Additionally, the record does not indicate that the consent was purged of the taint of Elias' illegal seizure. *See Washington*, 490 F.3d at 776-77. The Court looks to three factors for this: (1) the temporal proximity of the consent and the illegal seizure; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). The government bears the burden. *Washington*, 490 F.3d at 776-77.

All factors weigh against the government. Elias was asked for consent shortly after the unconstitutional pat down and while still standing outside of his car during the traffic stop, which the Court has already determined was prolonged with the intention of obtaining consent or probable cause to search. There are no intervening circumstances that would change the analysis. Finally, the misconduct of Halloran was flagrant when the Court considers Halloran's ultimate motivations in the traffic stop. This type of conduct is similar to the "impermissible gamesmanship" said to violate the Constitution in *Gorman*. 859 F.3d at 719. The taint of the unlawful detention and search was not purged.

## CONCLUSION

The admitted, publicized purpose of the Domestic Highway Enforcement

**ORDER GRANTING MOTION TO SUPPRESS * 13**

Team is to use traffic stops to investigate beyond the purpose of the stop. Of necessity, this practice is likely to run afoul of *Rodriquez* because unrelated questions, however innocuous, extend the stop. 135 S.Ct. at 1609. Such is this case here.

**Accordingly, IT IS HEREBY ORDERED:**

1. Defendant's Motion to Suppress, ECF No. 33, is **GRANTED**.
2. All evidence obtained through the search of Defendant's vehicle shall be **SUPPRESSED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies to counsel.

**DATED** this 5th day of February, 2018.

*s/Robert H. Whaley*
ROBERT H. WHALEY
Senior United States District Judge

**ORDER GRANTING MOTION TO SUPPRESS * 14**